## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PHILADELHIA MARINE TRADE
ASSOCIATION,

         Petitioner,

    v.

INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION,
LOCAL 1291,

         Respondent.

Civil Action No._____

## PETITION TO VACATE ARBITRATION AWARD

Petitioner Philadelphia Marine Trade Association ("PMTA" or the "Association"), by

and through undersigned counsel, files this Petition to Vacate Arbitration Award against

Respondent International Longshoremen's Association, Local 1291 ("ILA Local 1291" or the

"Union") pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and

the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and avers as follows:

## PRELIMINARY STATEMENT

This case involves an arbitration award issued by Arbitrator Scott E. Buchheit on January

30, 2026 (the "Award"). A copy of the Award is attached as Exhibit A. In his Award, Arbitrator

Buchheit conjured out of thin air a restriction on the right of PMTA members to reassign

longshoremen working as "Stackers" between a vessel and the dockside "yard," where no such

restriction exists in the collective bargaining agreement between PMTA and Local 1291, and

where Arbitrator Buchheit's own factual findings demonstrate that PMTA members routinely

reassigned Stackers when circumstances required. Arbitrator Buchheit then manufactured a

contractual requirement that Stackers receive an additional two hours of pay when reassigned

from the vessel to the yard or vice versa, again where no such requirement exists in the parties' collective bargaining agreement and there was no practice of providing such compensation, because Arbitrator Buchheit believed it was necessary to compensate Stackers for "the disruption to the workday" of the affected employees.  By awarding Stackers an additional two hours of pay where no such requirement exists in the parties' agreement, Arbitrator Buchheit clearly exceeded his authority.  The parties' collective bargaining agreement specifically states that an arbitrator "shall not have jurisdiction to add to, modify, vary, [or] change the terms of the collective bargaining agreement."

Simply put, Arbitrator Buchheit's Award is the epitome of an arbitration award that fails to "draw its essence" from the parties' collective bargaining agreement and instead represents an arbitrator dispensing "his own brand of industrial justice."  Thus, the Award falls squarely within the narrow range of arbitration awards that federal courts can, and should, vacate.  Accordingly, PMTA has filed this Petition seeking a judgment vacating the Award.

## PARTIES

1.     PMTA is a non-profit organization comprised of stevedores who operate in the port of Philadelphia. As relevant here, on behalf of its members, PMTA negotiates a collective bargaining agreement ("Local Agreement") and represents them with respect to the application of the Local Agreement to their employment of longshoremen.  PMTA's headquarters is located at 2 International Plaza, Suite 310, Philadelphia, PA 19113 and operates in Philadelphia, PA on a regular basis.

2.     ILA Local 1291 is a labor organization representing employees in industries affecting commerce within the meaning of the Labor Management Relations Act, 29 U.S.C. § 185.

LEGAL\113475956\6

3.     ILA Local 1291 has its principal office at 3460 N. Delaware Avenue, Philadelphia, PA 19134.

4.     ILA Local 1291 is the sole and exclusive bargaining representative for longshoremen who are employed by PMTA's members at the Port of Philadelphia.

5.     Greenwich Terminals ("Greenwich" or "Employer") is a Pennsylvania corporation with its principal office at 3301 S. Christopher Columbus Boulevard, Philadelphia, PA 19148.

6.     Greenwich is a member of PMTA and employs longshoremen who are bargaining unit members of ILA Local 1291, and subject to the terms and conditions of the Local Agreement entered into by PMTA and ILA Local 1291.

## JURISDICTION, VENUE, AND TIMELINESS

7.     This Court has subject matter jurisdiction over this action pursuant 28 U.S.C. § 1331 and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

8.     This Court has personal jurisdiction over the Union because it maintains its principal office in Philadelphia, Pennsylvania, it entered into the applicable Local Agreement with PMTA in Philadelphia, PA, and its agents are actively engaged in representing certain Greenwich employees subject to the terms and conditions of the Local Agreement between PMTA and ILA Local 1291 within the City of Philadelphia. *See* 29 U.S.C. § 185(c).

9.     Venue is properly laid in this Court because the events giving rise to this Petition occurred in Philadelphia, PA; Greenwich's ILA Local 1291 employees involved in the events giving rise to this Petition were employed in Philadelphia, PA; and ILA Local 1291 is a resident of Philadelphia, PA. *See* 28 U.S.C. § 1391(b); 29 U.S.C. § 185(a).

10.     This action is timely because it is filed within thirty (30) days of the issuance of the arbitration award that PMTA asks this Court to vacate. *E.g.*, *Serv. Emp. Int'l Union Loc. No.*

*36, AFL-CIO v. Office Ctr. Servs., Inc.*, 670 F.2d 404, 409 (3d Cir. 1982) ("We therefore conclude that actions to vacate or confirm an arbitration award under section 301 should be governed by the relevant state statute of limitations"); Pa.C.S.A. § 7321.24 (setting forth that a petition to vacate an arbitration award must be filed within 30 days after the movant receives notice of the award).

### FACTUAL BACKGROUND

11.    In the Port of Philadelphia, two collective bargaining agreements, a Master Contract and a Local Agreement, govern the terms and conditions of longshoremen employed by PMTA members. (Ex. A, Award p. 2). The Master Contract is negotiated by the United States Maritime Alliance (on behalf of management members, including PMTA) and the International Longshoremen's Association (on behalf of itself and each of its affiliated Districts and Locals, including Local 1291). (*Id.*). The Local Agreement is negotiated by the PMTA (on behalf of its constituent members, including Greenwich) and ILA locals who represent employees working in the Port of Philadelphia, including Local 1291. (*Id.*).

12.    The Local Agreement includes a grievance and arbitration provision that provides that an arbitrator hearing a grievance pursuant to the Local Agreement "shall not have jurisdiction to add to, modify, vary, change or remove any terms of the Collective Bargaining Agreement." (Ex. B at p. 4).

13.    Greenwich operates Packer Avenue Marine Terminal with both yard and vessel operations, including the loading and unloading of cargo from steamship vessels and the movement of the cargo around the terminal yard. (Ex. A, Award p. 2-3).

14.    Greenwich employs longshoremen as Reach Stacker Operators (referenced further herein as "Stackers") who utilize a machine called a reach stacker to move cargo. Some Stackers have original shift assignments to work in the yard, moving containers off and on trucks carrying

4

the containers. Other Stackers have original shift assignments to work on vessels, moving containers off and on those ships. (Ex. A, Award p. 3).

15. The Stackers employed by Greenwich are represented by ILA Local 1291 and the Local Agreement applies to the terms and conditions of their employment. *See* copy of the relevant provisions of the Local Agreement attached hereto as Exhibit B.

16. Stackers who work in the yard and on vessels receive the same hourly rate of pay, but they have different working conditions and guarantees. (Ex. A, Award p. 3). This is in part because the yard operation has set hours of operation while vessel operations do not. (*Id.*). The vessel operations proceed continuously so long as there are ships present with containers to load or unload. (*Id.*).

17. Greenwich daily advises the Union of the number of Stackers it will need the following day, and the Union then seeks to provide the number of longshoremen needed to serve as Stackers. (Ex. A, Award p. 3).

18. Sometimes the number of longshoremen provided by the Union to serve as Stackers is not sufficient to perform the work that needs to be done at the time the Employer wants it done. (Ex. A, Award p. 3-4). This insufficiency can result from illness, unpredictable aspects of Greenwich's operations or because the Union simply fails to supply the requested number of longshoremen needed to serve as Stackers. (Ex. A, Award p. 4).

19. An imbalance between the need for and availability of Stackers can result in disruptions to the Employer's operations. (Ex. A, Award p. 4). For example, trucks can be lined up waiting for containers to be unloaded or loaded by Stackers working in the yard operation. (*Id.*). At the same time, Stackers assigned to work on vessels occasionally have no work to be

performed because there is no vessel present that needs to be loaded or unloaded. (*Id.*). The opposite imbalance between yard and vessel needs also occurred. (*Id.*).

20.     Prior to 2024, these imbalances were sometimes addressed by Stackers moving from working on vessels to working in the yard, or from working in the yard to working on the vessels. (Ex. A, Award p. 4). This was not done frequently, and the circumstances varied under which this was accomplished when it did occur. (*Id.*). A Stacker sometimes did it as a favor for a foreman, sometimes to perform a discrete task, sometimes after his work obligation was completed on his original assignment, and perhaps still other times when a Stacker was instructed to do so. (*Id.*).

21.     When Stackers moved from one assignment to another, the Stacker did not receive pay for doing both yard and vessel work, but sometimes the Stacker would receive some additional benefit, such as an additional hour or two of pay as determined in the discretion of the foreman who is also a Union bargaining unit member. (Ex. A, Award p. 4).

22.     The Agreement, however, does not restrict Greenwich from moving Stacker assignments from the yard to the vessel or vice versa. (*See* Ex. B).

23.     In 2024, the Union filed a grievance believing that there was a change in an alleged past practice asserting work in the yard and on the vessels had been treated as two separate operations. (Ex. A, Award p. 4). The Union argued that the vessel/yard change resulted in Stackers working when they would otherwise have been on standby for work or permitted to go home with a minimum pay guarantee, other times missing breaks that they otherwise would have enjoyed. (Ex. A, Award p. 5).

24.     The parties proceeded to process the Union's grievance through each step required in the Local Agreement.

25.     The parties appeared before Arbitrator Scott E. Buchheit for a hearing on the grievance asserting a change to an alleged past practice that kept terminal yard work and vessel work as two separate operations.

26.     On January 30, 2026, Arbitrator Buchheit issued the Award.

27.     Arbitrator Buchheit's Award contained the following conclusions and determinations:

    a.     Arbitrator Buchheit specifically concluded "there is no contractual provision, either in the Master or Local Agreements, requiring that the Employer treat the Stackers who are assigned to work on vessels and those that are assigned to work in the yard as working in separate operations for purposes of contractual entitlements."  (Ex. A, Award p. 12).

    b.     Arbitrator Buchheit expressly found that Greenwich had routinely reassigned Stackers from yard to vessel or vice versa when required under a variety of circumstances.  As stated in his Award, reassignments from yard to vessel or vessel to yard "were not done frequently, and the circumstances varied under which this was accomplished and when it did occur.  A Stacker would sometimes do it as a favor for a foreman, sometimes to perform a discrete task, sometimes after his work obligation was completed on the original assignment, and perhaps sill other times when a Stacker was instructed to do so.  On none of these occasions did the Stacker involved receive the benefit of pay doing both yard and vessel work, but sometimes the Stacker would receive some additional

compensation, such as an additional hour or two of work." (Ex. A, Award at p.4 ).

c.    Based on that finding, Arbitrator Buchheit concluded, "prior to 2024 there was a past practice of Stackers **normally** being assigned to, and then working their entire shift in, either vessel or yard positions." (Ex. A, Award p. 12) (emphasis added).

d.    He also concluded, "***in general***, prior to 2024 they were not required to move back and forth between vessel and yard assignments against their will." (Ex. A, Award p. 13) (emphasis added).

e.

f.    As a remedy, Arbitrator Buchheit decided, "[t]he general remedy I therefore will grant is to return to, and preserve, the practice as it existed prior to it becoming blurred by more frequent deviations in 2024." (Ex. A, Award p. 14). Thus, despite recognizing that nothing in the parties' collective bargaining agreement treats yard and vessel operations as separate operations for purposes of contractual entitlements, and despite finding that Greenwich had a history of reassigning Stackers when circumstances required, and concluding that only "in general," Stackers "normally" were not required to move back and forth between vessel and yard assignments, Arbitrator Buchheit purported to create a new contractual restriction on such reassignments with no criteria whatsoever to decide when such reassignments are permissible.

g.    Beyond creating a new contractual restriction on reassignment of Stackers, Arbitrator Buchheit went on to determine that Stackers who are reassigned are entitled to additional pay. According to his Award, "The question that remains for me to decide is what additional compensation, if any, Stackers are entitled to on the infrequent occasions when they were or will be compelled against their will to do both vessel and yard work on the same shift." (Ex. A, Award p. 14).

h.    Arbitrator Buchheit rejected the Union's request for a broad remedy, saying, "Clearly, there has been no practice of what the Union here seeks, which is to make the Union and all affected bargaining unit members financially whole for all losses of pay, including minimum hours guarantees, because of the Company's assignments to dual operations without paying for both." (Ex. A, Award p. 14-15).

i.    However, Arbitrator Buchheit issued the following remedy: "[W]ithin the period covered by this grievance any Stackers who performed both yard and vessel work within the same work shift shall receive two additional hours of pay for doing both of those assignments." (Ex. A, Award at 15). The basis for this remedy was his finding that on occasion, Stackers had "sometimes" received "an extra hour or two of pay." (Ex. A, Award at 4). Arbitrator Buchheit explained, "I choose two hours rather than one because the extent of the disruption to the workday of the impacted Stackers warrants the higher of the two traditional forms of compensation

for performing both yard and vessel work during the same assignment."
(*Id.*).

## COUNT I - THE ARBITRATION AWARD SHOULD BE VACATED

28.     PMTA incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

29.     Under the Labor Management Relations Act, 29 U.S.C. § 185, an arbitration award should be vacated when the arbitrator exceeded his authority, violated the collective bargaining agreement, acted with bias, or if the award violates public policy.

30.     Under the Federal Arbitration Act, this Court may vacate an arbitrator's award where the arbitrator has exceeded his powers or has so imperfectly executed his powers that a mutual, final, and definitive award upon the subject matter submitted was not made. 9 U.S.C. § 10(a)(4).

31.     The Supreme Court has long recognized that "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *United Steelworkers of Amer. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). Moreover, an "award is legitimate only so long as it draws its essence from the collective bargaining agreement." *Id.*

32.     In this case, Arbitrator Buchheit clearly exceeded his authority, and issued an Award that does not draw its essence from the parties' collective bargaining agreement but instead represents only his own brand of industrial justice.

33.     The Local Agreement between PMTA and ILA Local 1291 expressly provides that an arbitrator "shall not have jurisdiction to add to, modify, vary, change or remove any terms of the Collective Bargaining Agreement." (Ex. B at p. 4). Arbitrator Buchheit's Award does precisely what the parties' agreement prohibits.

10

34.     First, it is undisputed that there is no restriction in the Local Agreement prohibiting the Greenwich from moving a Stacker between terminal yard and vessel assignments during a shift.  Arbitrator Buchheit acknowledged as much in his Award, noting that nothing in the parties' agreement treats yard and vessel operations as separate operations for purposes of contractual entitlements.  (Ex. A, Award at p. 12).  Nonetheless, despite finding that Greenwich had a history of reassigning Stackers when circumstances required for a variety of reasons, he then issued an award that purports to require Greenwich to "return to, and preserve, the practice as it existed prior to it becoming blurred by more frequent deviations in 2024."  (Ex. A, Award at 14).  However, the Award provides absolutely no guidance as to what this means.[1]  To the extent that this Award purports to place restrictions on Greenwich's right to reassign Stackers when it deems necessary based on the circumstances, as it had done in the past, the Award exceeds the authority granted to Arbitrator Buchheit under the parties' collective bargaining agreement by adding to, modifying and changing the terms of the agreement.

35.     Moreover, by awarding Stackers who are reassigned from yard to vessel or vice versa an additional two hours of pay, Arbitrator Buchheit issued an Award that fails to draw its essence from the parties' collective bargaining agreement and dispensed his own brand of industrial justice.  Arbitrator Buchheit made a specific factual finding that on "none of these occasions [*i.e.,* when a Stacker was reassigned between vessel and yard during a shift] did the Stacker involved receive the benefit of pay doing both yard and vessel work, but ***sometimes*** the Stacker would receive some additional compensation, such as an additional hour or two of

---

[1] The failure of this arbitration award to provide proper guidance on the Employer's ability to continue its pre-2024 practice of infrequently moving Stackers between vessel and yard assignments and vice versa, which Arbitrator Buchheit indicates the Employer should be able to do (Ex. A. Award at 14) provides another basis for vacating this award.  It is unclear when the threshold is met beyond which Greenwich is prohibited from re-assigning Stackers.  This lack of clarity in Arbitrator Buchheit's Award provides another basis for vacating his Award.  Specifically, by failing to grant a mutual, final and definitive award, the Award may be vacated pursuant to the Federal Arbitration Act. *See* 9 U.S.C. § 10(a)(4).

work." (Ex. A, Award at 4) (emphasis added). However, in the remedy section of his Award, Arbitrator Buchheit elevated this finding of the occasional, gratuitous grant of an additional **_hour or two_** of pay into a binding practice and requiring Greenwich to **_always pay two hours_** of additional pay. And, he expressly did so based not on anything in the parties' collective bargaining agreement, but solely on his belief that reassignments caused "disruption to the workday of the impacted Stackers." (Ex. A, Award at 15). This remedy is wholly untethered from the parties' collective bargaining agreement, contrary to the arbitrator's own factual findings, and reflects nothing more than Arbitrator Buchheit dispensing his own brand of industrial justice.

**WHEREFORE,** PMTA respectfully requests that the Court grant this Petition, enter judgment in its favor and against ILA Local 1291, and that the Court issue an order VACATING the arbitration award issued by Arbitrator Buchheit on January 30, 2026, and that the Court award PMTA all other further legal and equitable relief as justice requires.

Respectfully submitted,

COZEN O'CONNOR

Dated: February 27, 2026

/s/ David L. Hackett
/s/ Andrew J. Rolfes
By: David L. Hackett
By: Andrew Rolfes
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Phone: 215-665-2000

*Attorneys for Petitioner Philadelphia Marine Trade Association*

# EXHIBIT A

In the Matter of Arbitration Between:

PHILADELPHIA MARINE TRADE ASSOCIATION

("PMTA")

    and

INTERNATIONAL LONGSHEREMEN'S
ASSOCIATION, LOCAL 1291

("Union")

OPINION

AND

AWARD

The instant grievance involves a dispute between the PMTA, on behalf of its member Greenwich Terminals ("Employer/Company"), and the Union over the assignment of, and resulting compensation and working conditions for, employees who work as Reach Stacker Operators ("Stackers/Grievants"). The Union seeks both retrospective and prospective remedies on behalf of these Stackers. The PMTA maintains that the grievance is entirely without merit.

Throughout these proceedings, Michelle Devitt, Esquire represented the Union. Alfred J. D'Angelo, Jr Esquire represented the Employer. Counsel for both parties submitted extensive post-hearing briefs.

**PROPOSED ISSUES**

Union: Did the Company violate and unilaterally alter a binding past practice under the contract by assigning Stackers who were working in conjunction with a vessel to work a second simultaneous operation in the yard, and by failing to provide the minimum contractual pay for each during the hours worked in both?

Employer: Did the Company violate the CBA when terminal Stackers assigned to the vessel were temporarily moved to the yard or vice versa?"

**FACTS**

For the Port of Philadelphia ("Port"), both a Master Contract and Local Agreement ("CBA") have applicability. The Master Contract is negotiated by the United States Maritime Alliance (on behalf of management members, including the PMTA) and the International Longshoremen's Association (on behalf of itself and each of its affiliated Districts and Locals, including Local 1291). The Local Agreement is negotiated by the PMTA (on behalf of its constituent members, including Greenwich) and ILA locals who represent employees working in the Port, including Local 1291. The Master Agreement provides that manning, staffing, and the number and use of employees in all crafts shall be the subjects of local bargaining.

Greenwich, which operates Packer Avenue Marine Terminal, has both yard and vessel operations at that location. Historically, yard operations at the Greenwich Terminal

were covered by terms negotiated with Local 1332, while vessel operations were negotiated with Local 1291. In 1996 these two Locals merged into Local 1291, and thereafter Local 1291 negotiated for compensation and terms and conditions of employment for employees who worked in both the yard and vessel operations, specifically the loading and unloading of cargo from steamship vessels and the movement of the cargo around the terminal.

The Grievants are terminal Stackers hired by Greenwich to move this cargo by using a machine called a reach stacker. Some Stackers have original shift assignments to work in the yard, moving containers off and on trucks carrying the containers. Other Stackers have original shift assignments to work on vessels, moving containers off and on those ships.

Stackers who work in the yard and on vessels receive the same hourly rate of pay, but they have different working conditions and guarantees. This is in part because the yard operation has set hours of operation while vessel operations do not. The vessel operations proceed continuously so long as there are ships present with containers to load or unload.

The Employer daily advises the Union of the number of Stackers it will need the following day, and the Union then is to provide the needed number to the Employer. Stackers with the highest seniority are given the first opportunity to be assigned to positions working on the vessels.

Sometimes the number of Stackers made available to the Employer are not sufficient to perform the work that needs to be done at the time the Employer wants it

done. This can result from the Union's inability to provide the number of Stackers the Employer has requested due to illness or for other reasons, or because of unpredictable aspects of the Employer's operation.

An imbalance of the need for, and availability of, Stackers can result in disruptions to the Employer's operations. For example, trucks can be lined up waiting for containers to be unloaded or loaded by Stackers working in the yard operation. At the same time, it is possible that Stackers working on vessels do not have work to be performed, as there is no vessel present that needs to be loaded of unloaded. The opposite imbalance between yard and vessel needs can also occur.

Prior to 2024, these imbalances were sometimes addressed by Stackers moving from working on vessels to working in the yard, or from working in the yard to working on vessels. This was not done frequently, and the circumstances varied under which this was accomplished when it did occur. A Stacker would sometimes do it as a favor for a foreman, sometimes to perform a discrete task, sometimes after his work obligation was completed on the original assignment, and perhaps still other times when a Stacker was instructed to do so. On none of these occasions did the Stacker involved receive the benefit of pay doing both yard and vessel work, but sometimes the Stacker would receive some additional compensation, such as an additional hour or two of work.

In 2024, the Union filed the instant grievance. The Union believed that there was a change in the past practice which had existed in the past concerning work in the yard and on the vessels being treated as two separate operations. According to the Union Stackers were now being directed against their will, and on a more frequent basis, to

perform both the yard and vessel Stacker work without additional compensation or an adjustment in their guarantees and/or breaks for doing so. According to the Union, sometimes the vessel/yard change resulted in Stackers working when they would otherwise have been on standby for work or permitted to go home with a minimum pay guarantee, other times missing breaks that they otherwise would have enjoyed.

This grievance was heard by the parties and went through mediation and no resolution was obtained. The Union then moved it to arbitration. This Award results.

## SUMMARY POSITION OF THE UNION

The language of the CBA, along with the consistent testimony of Stackers with over a century and a half of combined experience on the waterfront, clearly establishes a long history of separate yard and vessel operations, for which Stackers have different contractual guarantees, and are separately compensated. The evidence clearly checks off every box to establish a practice arising to the level of a contractual undertaking: 1) clarity and consistency of conduct; 2) longevity and repetition of the practice; 3) compliance by both parties; and 4) underlying circumstances from which the practice arises.

Yet beginning in March of 2024, the Company essentially decided it had the authority to relieve a shortage of available Stacker labor, and save money at the same time, by doubling up the work loads of Stackers attached to vessels at the Greenwich Terminal. This was not "business as usual," or even a regrettable or occasional variance forced by shortages, but a dramatic shift in how vessel Stackers work. To accomplish it,

the Company violated its contract with the Union by ignoring the decades-long, mutually recognized, and therefore binding work practices separating vessel assignment from yard assignments and compensating them accordingly.

The Company mischaracterizes the Union's argument by arguing that there is no past practice or contract language providing for Stackers to be "paid twice" or "paid double" for working on the terminal. Rather, the core of the issue is that Stackers are entitled to the full benefits of each operation for which they are hired, including every paid break, every regular hour, every overtime hour, and every minimum hours guarantee, even—or especially—if those operations overlap.

Because the Company could not rebut the Union witness testimony about the clearly established past practice of Stackers working one operation at a time, Company witnesses instead attempted to muddy the waters with unrelated issues, including spelling or manning practices on barges and small boats, or past examples of serial assignments, or reassignments from one operation to the other. None of these situations reflect the violation being challenged here, and the Company cannot use these examples to disprove the otherwise established past practice.

In short, the Company violated the contract by requiring Stackers hired for a vessel operation to move back and forth to work yard operations, depriving them of their down times and spells, and without any additional compensation for the simultaneous assignment.

Therefore, this grievance against Greenwich should be sustained to maintain its compliance with the long-settled past practices regarding Stacker operations. As a remedy, the Arbitrator should order the Company to:

- Cease and desist violating the CBA by returning to the status quo prior to March 15, 2024, of not assigning vessel Stackers to a second simultaneous operation.

- Cease and desist violating the CBA by returning to the status quo prior to March 15, 2024, regarding the spelling, hours guarantees, and other benefits of Stackers in every operation they work.

- Make the Union and all affected bargaining unit members financially whole for any and all losses of pay, including minimum hours guarantees, as a result of the Company's assignments to dual operations without paying for both.

- Rescission of any disciplines issued as a result of Stackers' refusals to work for dual operations in violation of the contract.

The Union requests additional relief as deemed appropriate by the Arbitrator. The Union further requests that the Arbitrator retain jurisdiction regarding any disputes arising out of the implementation of the remedy.

## SUMMARY POSITION Of THE EMPLOYER

As this is a contract interpretation case, the burden is on the Union to prove that a violation occurred.  It has not met that burden.

Importantly, the Union does not assert that there was a violation of the CBA itself. The Union could point to no term in that Agreement that in any way restricted the Company on the movement of terminal Stackers from the yard to the vessel or vice versa.

As Company witnesses testified, where such movement occurred, no employee lost any guaranteed time and an employee that was moved from the vessel to the terminal would go back to the vessel once the terminal work was finished or vice versa. The Union did not dispute any of those facts.

Rather, the Union claims there is a "binding negative past practice" of not moving individuals from the terminal to the vessel or vice versa in the operation of a Stacker. An arbitrator cannot find that the absence of an act constitutes a binding past practice on an Employer or on a Union. While arbitrators have recognized that a proven overt past practice, that is unequivocal and consistent and recognized by both parties, may be binding on the parties, the Employer is not aware of any decisions that have ever determined that there can be a negative past practice.  No arbitrator has found that since a Company did not do something, that it had now limited itself in the ability to do that thing.

As the facts in this case show, even if there could be a negative past practice, there was no such past practice proven. Indeed, the two witnesses that the Union

presented, who either had worked or currently work the terminal, testified that at times the foreman would "move men as needed." Raymond Bailey, originally a member of Local 1332 who has worked in the longshore industry since 1977, testified that at times when working in the yard the foreman will have Stackers moved to the vessel. This occurs when someone does not show up, or someone gets sick on the job, or for other such reasons. It was not the Stacker's initial assignment, but he did move to the vessel, and then once completed would go back to the yard. As Bailey testified, sometimes the foreman will give that Stacker an hour of added pay but certainly not for the entire time when working on the vessel after being moved from the yard or vice versa. Nigel McClennon, a retired longshoreman who worked at the trade for 43 years and was also a member of Local 1332, testified similarly to Bailey.

The complaint of these two witnesses was that they believed they should have been double paid for the time they were moved. Yet each witness, including the Union business agents, agreed that there is no provision in the contract for such double pay. This distinguishes the situation of the Stackers from that of deep-sea vessel gangs, who have a contractual right to additional pay in certain circumstances.

Company witness John Burleson testified that he has been working at Packer Avenue Marine Terminal for approximately 35 years. During that time, his functions included being the terminal manager for the terminal yard. Burleson testified that during the period in which he was terminal manager Stackers were moved from the vessel to the terminal or vice versa when needed. He testified this did not and does not happen often, but it occurs when the Union is unable to supply all the requested labor, when

there are call-outs or conditions are such that it requires that the Company move a Stacker from one location to the other. He testified that there had never been a time when this had been challenged until the instant case, and it has never been the topic of negotiations. Furthermore, in support of his testimony Burleson went back through records to find examples to dispute all the assertions made by the Union and testified about those matters at the hearing. He also testified about the two specific situations cited by the Union in the grievance, explaining why the actions on those days were necessary and reasonable. When the Union does not fulfill its obligation to supply qualified personnel, the Company must respond as needed.

Foreman Larry Bonner, Jr. also testified that in his entire career, during which he was both the Assistant Foreman on the terminal and then succeeded his father as Foreman, that he would move Stackers from the terminal to the vessel when needed. This did not happen frequently but at times it was necessary to make up for manning shortages, people leaving at the end of guarantee period even though the job was not finished, someone leaving sick, or other reasons. Similarly, he has moved Stackers from the vessel to the terminal when needed, usually due to a shortage of Stackers. It was not until March 2024 that he was challenged by a grievance.

The Union ignores the fact that all the Stackers in question are "terminal employees." Their only connection to the vessel is that when they work with the vessel they are bound by the vessel start times and guarantees. Yet they remain terminal employees on the terminal list. As terminal employees, they work under the direction of

Terminal Foreman Bonner. As such, while they may initially be assigned to the yard or to the vessel, they are subject to reassignment as needed.

This industry is not a static one. It is dynamic based upon the needs of the day in question, the manpower that come to work on the day in question, the backlog in the yard and similar factors. It is Bonner's job to adjust to the needs based upon the employees available. As he and Burleson testified, at times those needs require him to move Stackers from their initial assignment. The movement is good management and no provision of the CBA in any way restricts such movement. In all cases, the Stackers were returned to their initial assignment and lost no hours because of the movement.

A Stacker's one job is to operate the stacker machine. Whether the Stacker is with the vessel or the yard, the job is the same. The Stacker is not performing two jobs at the same time, only one job but in a different location.

This is a case wherein the Union is seeking to achieve through arbitration a "double pay" benefit it has not negotiated into its contract. The Union asks the arbitrator to implement a "penalty payment" which is beyond the arbitrator's jurisdiction. It is axiomatic that an arbitrator is constrained by the terms of the labor agreement and may not augment it by creating a benefit not contained within the agreement nor impose restrictions not contained within the agreement.

The Employer has clearly retained the right of assignment and reassignment of Stackers, and the Union has not demonstrated any past practice which shows that the Company had forfeited that right of assignment. This inescapable conclusion that the

11

Employer has not violated the CBA is fully supported by arbitration precedent. The grievance must be denied.

**OPINION**

As PMTA stresses, there is no contractual provision, either in the Master or Local Agreements, requiring that the Employer treat the Stackers who are assigned to work on vessels and those that are assigned to work in the yard as working in separate operations for purposes of contractual entitlements. To its credit, the Union does not contend to the contrary.

It follows that the only avenue the Union has available to prevail in this matter is to establish that a past practice has existed that now requires the Employer to treat vessel and yard work assignments as two separate operations. It is well settled that if certain criteria are met than an established past practice can be binding. That criterion includes clarity and consistency of conduct, as well as longevity and repetition of the practice that establishes compliance by both parties.

I am persuaded by the Union that it has met its burden of applying these criteria to establish that prior to 2024 there was a past practice of Stackers normally being assigned to, and then working their entire shift in, either vessel or yard positions. This was established by the fact that Stackers working in the vessel or yard positions for many years have been, and still are, entitled to different contractual benefits and guarantees that do not easily transfer from work on the vessels to work in the yard. Neither do working conditions, such as breaks, easily transfer from vessel to yard work.

Furthermore, I am satisfied from the testimony of Union witnesses that in general prior to 2024 they were not required to move back and forth between vessel and yard assignments against their will.

This conclusion is not necessarily inconsistent with the testimony of the Employer witnesses. Burleson candidly testified that it was only infrequently that a Stacker assigned to vessel work would do yard work during the same shift, or the reverse. Clearly there was a practice understood by both sides that there was normally a distinction between these two different types of assignments, and for that reason senior employees were given first opportunity to select the assignments they wanted.

I reject the characterization of the PMTA that this was a "negative past practice" that is not known or enforceable in labor relations. While it is true that an company does not necessarily lose a management right by not acting upon it, in this instance what the Union is contending is that Stackers assigned to vessel positions lost preferable working conditions when being compelled to perform yard work during their shift, such as the right to remain in paid standby status, go home when work was completed, or take breaks if required against their will to do yard work during their shift. This is a legitimate claim of a lost past practice.

I am further persuaded by the Union that by the time the instant grievance was filed in 2024 the Employer had begun to blur the line between vessel and yard assignments in a way and with a frequency it had not done in the past. Perhaps it did this for a variety of good faith reasons, but the Stackers and the Union on their behalf had a valid concern that the normal separation between vessel and yard work was slipping

away. The Union therefore prudently and properly filed this grievance to prevent that from happening.

I will therefore sustain the grievance, as the Union has carried its burden of establishing that there has been an erosion of an historical and binding past practice. The general remedy I therefore will grant is to return to, and preserve, the practice as it existed prior to it becoming blurred by more frequent deviations in 2024.

As to the implementation of this remedy, it is well settled that a past practice is no broader than the circumstances that created it. This is an important principle for purposes of the remedy in this case, as the Employer has established that historically there have been many exceptions to the general practice of normally treating the vessel and yard assignments as separate operations for purposes of employee assignments. In particular, the Employer has established that on the infrequent occasions where unforeseen circumstances beyond its reasonable control truly necessitated it crossing the line between these assignments it has done so. It follows that in the future it will likewise be able to do so on a limited basis, as the past practice I have found never applied to those circumstances.

The question that remains for me to decide is what additional compensation, if any, Stackers are entitled to on the infrequent occasions when they were or will be compelled against their will to do both vessel and yard work on the same shift.[1] Clearly

---

[1] I express no opinion on any dispute involving crane staffing, as I need not do so to decide this case properly.

I also express no opinion on the propriety of any discipline that might have resulted from the circumstances of this matter. This is a case of contract interpretation, not discipline, and I will not merge the two.

there has been no practice of what the Union here seeks, which is to make the Union and all affected bargaining unit members financially whole for all losses of pay, including minimum hours guarantees, because of the Company's assignments to dual operations without paying for both. Neither is such an expansive remedy here warranted, particularly given that as the Employer stresses, Stackers are all considered to be terminal employees, whether assigned to vessel or yard work.

It does not follow, however, that Stackers required to do both yard and vessel work on a limited basis are not entitled to any financial remedy whatsoever. The evidence is clear that when in the past Stackers would work in both vessel and yard assignments, perhaps voluntarily, they would have an expectation of receiving an extra hour or two of pay. It follows that within the period covered by this grievance any Stackers who performed both yard and vessel work within the same work shift shall receive two additional hours of pay for doing both of those assignments. I choose two hours rather than one because the extent of the disruption to the workday of the impacted Stackers warrants the higher of the two traditional forms of compensation for performing both yard and vessel work during the same assignment.

Finally, I will retain limited jurisdiction over this case, to be exercised if needed to resolve any disputes over the retroactive remedy I have granted. As to the prospective remedy, it would not be proper for me to retain jurisdiction over things that have not yet happened and might not ever happen.

In the final analysis, this is not a case where I could or should draw bright lines, as the situation is more nuanced than that. I therefore will take the exercise of

reasonableness and good faith by both sides to remedy the past and adhere to what I have found going forward. Having had the privilege of working with these parties for many years now, I trust and expect that both will do this.

AWARD

The grievance is sustained consistent with the above Opinion.

The remedy is as set forth in this Opinion.

The Arbitrator retains limited jurisdiction over this case.

Signed this 30th day of January 2026

_____

SCOTT E. BUCHHEIT, ARBITRATOR

# EXHIBIT B

# PORTS OF THE DELAWARE RIVER MARINE TRADE ASSOCIATION
## SUITE 301 PORT ADMINISTRATION BUILDING
### 3460 N. DELAWARE AVENUE
### PHILADELPHIA, PA 19134

(?15) 426-2510                                                                                  (215) 426-4553

---

**CIRCULAR NO.:** 60–99                                        May 20, 1999

---

**TO:    ALL PMTA EMPLOYER MEMBERS**

**RE:    Grievance and Arbitration Procedure**

Ladies and Gentlemen:

Attached please find the new Grievance and Arbitration Procedure as agreed to by the PMTA and the ILA.

All grievances filed from this date forward and until further notice will be processed in accordance with time limits as outlined in this agreement.

Please note that default judgments can be awarded under this procedure if the time limits are not adhered to.

If you have any questions, please feel free to call.

Sincerely,

Uwe Schulz
President

US:pas

Attachment

CC:    J. Paylor, International Vice President
       R. Gladden, Atlantic Coast District Vice President
       A. J. D'Angelo, Jr., Esquire
       J. J. Kane, Esquire
       All ILA Locals

29.   <u>GRIEVANCE AND ARBITRATION</u>:

<u>Section 1</u>

All disputes and grievances of any kind or nature whatsoever arising under the terms and conditions of this and all questions involving the interpretation of this Agreement shall be processed in the following manner:

STEP 1:  Either party shall notify the other party in writing within twenty (20) calendar days of the occurrence on which the grievance is based. The party so notified shall respond to the other party in writing within seven (7) calendar days after notification.  In an emergency situation to address alleged unsafe working conditions, either party can request a job site grievance to be attended by the Grievance Committee referred to in Step 2 below.  If either

party fails to attend the said job site grievance, after receiving adequate written notice by way of mail, telegram or fax, that party will thereby waive its rights in the grievance and an award by default shall be rendered in favor of the other party.

STEP 2:  In the event the grievance is not settled at Step 1, the grievance may then be presented in writing to a Grievance Committee within fourteen (14) calendar days after the date the answer was due or received.  The Grievance Committee shall consist of two (2) individuals selected by the PMTA and two individuals selected by the Union.  The Grievance Committee shall meet within ten (10) calendar days after the grievance is submitted.  Either party in connection with any dispute or grievance where visual observation may be helpful in the resolution of the dispute or grievance may request that the Joint Grievance Committee meet at the job site.  The Grievance Committee shall have seven (7) calendar days after the date of the Grievance Committee meeting to issue a decision in writing.  If the Grievance Committee fails to meet within the time limits specified, the grieving party (Union or Employer) may process the grievance to Step 3 or may opt to permit the Step 2 meeting take place.

STEP 3:  Should the Grievance Committee be unable to resolve the issues submitted, either party may appeal the matter to Arbitration by filing a written demand with the Arbitrator to be selected by the parties as set forth herein. The demand must be filed with the American Arbitration Association in accordance with its rules on voluntary labor arbitration within twenty (20) calendar days after the Grievance Committee's answer was due or received in Step 2.

Either party in connection with any dispute or grievance where visual observation may be helpful in the resolution of the dispute or grievance may request that the Arbitrator and the parties meet at the job site.

Each ILA Local and the PMTA shall select an Impartial Arbitrator from a panel of Arbitrators submitted by the American Arbitration Association in accordance with its rules on voluntary labor arbitration.

The Arbitrator thus selected shall conduct their hearings and procedures in accordance with the Rules of the American Arbitration Association, except that upon request by either party, in a matter alleging violation of the no-strike/lockout provision of the Article, they shall be obliged to render their decisions within forty-eight (48) hours of the conclusion of their hearing or procedures.

Authority of the Arbitrators. The Arbitrators will make their findings and render their decisions to resolve the disagreements. The Arbitrators shall not have jurisdiction to add to modify, vary, change or remove any terms of the Collective Bargaining Agreement.

Effects of Decision. The decisions of the Arbitrators shall be final and binding upon the parties.

Retroactivity. Awards or settlements of grievances shall in no event be made retroactive beyond the date of the alleged grievance. All claims for back wages shall be limited to the amount agreed to by the Employer and the Union, or ordered by the Arbitrator, as the case may be, less any unemployment compensation or other compensation that the aggrieved employee may have received from any source during the period for which back pay is claimed.

Should the terms and conditions of an Agreement fail to specifically provide for an issue in dispute or should a provision of an Agreement be the subject of disputed interpretation, the Arbitrator shall consider port practice in resolving the issue before him or her. If the Arbitrator determines that there is no port practice to assist him or her in determining an issue not specifically provided for in the Collective Bargaining Agreement or no port practice to assist him or her in determining the interpretation of the Agreement, the issue shall become the subject of negotiation between the parties.

There shall be no strike, sympathy strike, picketing, stoppage of work, slowdown, walkouts/sitdowns, sickout, job action, boycott or other illegal interference with operations or no lockout during the pendency of any dispute or issue which is before the Grievance Committee or Arbitrator.

The cost of Arbitrator's fees in all arbitration proceedings under this Agreement will be funded by PMTA.

The perishable cargo perpetual no-strike clause is attached hereto as Appendix B.

...transportation allowance of $2.50 each per day, for traveling expenses. If a New Jersey resident is hired as a man in the Hiring Center, he will be paid $2.50 per day.

(x)    In the event that any employee attempts to register with another employee's identification card, upon discovery of such practice, both employees involved shall be declared ineligible from receiving SUB Plan benefits for a period of twelve months following the discovery.

(y)    The parties agree to modify the payment procedure in the administration of the SUB payments by deducting payment for the Vacation and Holiday pay by spreading the deduction equally among all of the remaining bi-weekly settlements during the contract year in which the payments are made rather on a lump sum basis as in the previous agreements.

20.    WHEN MEN ARE WORKING CERTAIN CARS:

When certain cars are not finished at Noon or at 5:00 PM, the same men, if present, shall be hired to finish the car or cars.

21.    SUPERVISORS, INCLUDING FOREMEN, are not to be permitted to do any work whatsoever, that is normally done by carleaders.

22.    CAMDEN AND GLOUCESTER:    Work conducted at Camden and Gloucester shall be handled at same rates and conditions as for work in Philadelphia. Pennsylvania and Delaware residents who work in Camden and Gloucester shall be

(23)    REGULATION OF WORK:    Employer to have the right to work by any practical method, also to name the number of men in gangs and how many men are to be distributed on docks or lighters. The size of drafts or truckloads is to be at the discretion of the employer or his representative. It is understood and agreed between the parties hereto, however, that no employer shall be privileged to impose an unreasonable work burden upon his man or men.

24.    BULK LIQUID CARGO:

(a)    In loading or discharging bulk liquid cargo, the minimum employed shall be as follows:

(1)    Loading bulk liquids from tank trucks with trock pump two: (2) men.

(2)    Loading from tank trucks into deep tanks of vessel with portable pumps; five (5) men and foreman handling one of two pumps.

(3)    Loading from tank cars into deep tanks of vessels with portable pumps; one (1) pump - five (5) men and foreman. two (2) pumps - six (6) men and foreman.

If Cocoa Beans are being loaded into four (4) or more railroad cars, then one (1) additional cooper shall be employed. The cooper employed on the Pier also may be assigned to the above work, if the Cocoa Beans are being loaded into one (1), two (2), or three (3) trucks, containers or other conveyances. If the Cocoa Beans are being loaded into eight (8) or more trucks, containers or other conveyances, then one (1) additional cooper will be employed.

COCOA FACILITIES - When Cocoa Beans or other Cocoa products are being taken from Piers or Annexes to any overland conveyances, at least one (1) cooper will be employed. Additional men will be hired at the Employer's discretion when needed.

PIER MAINTENANCE - Members of Local 1566 who perform maintenance duties will be paid at the deepsea rates of $18.00 per hour first year, and $19.00 per hour second year, 10/1/95 to 9/30/96.

* There will be complete flexibility of cargo repairmen/coopers - no specialists.

* Local 1884 - Coopering to remain as per present practice.

(4) Local 1332

* A driver will load more than one (1) truck at a time, where practical based on work and safety conditions.

* "Ground men", i.e. chockman, etc. should be used as required by management where practical.

* There will be complete flexibility of carloaders - no specialists. All men will perform housekeeping duties as directed by the foreman.

* Management will have the ability to "swingload" all commodities with one (1) driver, where practical based on work and safety conditions.

* All starting times and flexibility as referred to above will apply
-- terminal work.

17. Same day rehire for non-arrival of vessel only, as long as there is a four (4) hour break from the end of the guarantee period to the new hire. The rehire will be at the prevailing rate of pay.

18. Any individual operating a fully automated dockside crane shall be paid premium wages and benefit contributions as per the Master Contract. Any Non-Master Contract operation or combination vessel operation requiring use of a crane for four (4) hours or less will require two (2) crane operators and they will be guaranteed four (4) hours at the prevailing rate and one (1) hour at 1 ½ the straight time hourly rate.

19. PMTA and ILA Local 1291 agree to continue the current practice of assigning Top Pick Operators to the vessel as needed. PMTA and ILA Local 1291 agree to form a committee of 3 representatives (2 of whom will be Terminal Representatives) to meet quarterly or as needed to review any manning issues on the terminal under this section. Both sides will meet in good faith to seek to resolve any differences.

   In a tandem or twin pick operation, the Employer and Terminal Foreman will look at the stow plan on a ship by ship basis to determine the number of top pick operators to be assigned to the vessel.

20. PMTA and Local 1291 shall create a Training Committee to identify areas of needed training and to develop a program to meet areas of shortage of trained, skilled operators. Priority training will be given to paper clamp operators and Crane Operators.

21. **Local 1291 Manning**

   A. **Palletized Perishables**

   |  | Year 1 | Year 2 | Year 3 |
   |---|---|---|---|
   | 6 Pallets | No change | No change | No change |
   | 4 Pallets | 13 + 1 | No change | No change |
   | 3 Pallets | 13 + 1 | No change | 12 + 1 |
   | 1 or 2 Pallets | 12 + 1 | No change | 11 + 1 |

   For Tioga Marine Terminal, as per current practice, when a gang is handling fruit with a thousand (1,000) units or more, an additional driver will be added to the wharf drivers.

10/03/96

2.    Terminal Labor - Employer will hire the number of persons it deems necessary as per current practice.

3.    On fully automated container vessels, after four (4) hours there shall be no hatch priority.

4.    With the gang's consent, gangs may be moved from vessel to vessel at the same terminal after initial guarantees have been satisfied.

5.    Minimum guarantee of four (4) hours to all hires except:

a).    Midnight and 1:00 A.M. hires in which case the guarantee extends until 8:00 A.M.

b).    5:00 P.M. and 6:00 P.M. hires in which case the guarantee is six (6) hours at one and one quarter (1 ¼) times the straight time rate except that this guarantee is reduced to four (4) hours if due to inclement weather; fumigation or break downs.

When a gang is rehired, the guarantee is four (4) hours with the exception of a two (2) hour guarantee due to inclement weather, fumigation, break downs or finish of hatch or vessel.

Should an employee refuse to work for any reason, said guarantees shall not apply.

6.    Minimum Manning Levels

a).    Scrap Ships

One Crane    4 + 1

Two Cranes    5 + 1

Three Cranes    6 + 1

1 Bulldozer    2 drivers

11